**Federal Defenders**
OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza, 16th Fl., Brooklyn, NY
11201 Tel: (718) 330-1200  Fax: (718) 855-0760

Tamara L. Giwa
*Executive Director and
Attorney-in-Chief*

Michelle A. Gelernt
*Attorney-in-Charge*

April 15, 2026

<u>BY ECF and Email</u>
The Honorable Ramon E. Reyes
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

*Re: United States v. Darren McKenzie*, 25-cr-304 (RER)
**PRELIMINARY STATEMENT**

Your Honor:

From as early as three years old, Mr. McKenzie never had a permanent, safe, and consistent household.  Throughout his childhood, he experienced significant dislocation, family separation, and witnessed extensive periods of substance abuse in his family.  He also was subjected to physical and emotional abuse from those closest to him.  Mr. McKenzie also struggled in school in special education classes, and ultimately left school after his first contact with the criminal justice system. He also has experienced significant disruptions in his adulthood, as he was incarcerated shortly after becoming a father and was attempting to build a stable life with his son's mother and now finds himself incarcerated again.  Mr. McKenzie has suffered from undiagnosed mental health challenges, which appear to be at the heart of the conduct in the instant case – a single punch to an undercover FBI agent.  Further, Mr. McKenzie has experienced significant trauma due to his incarceration in the instant matter that has exacerbated some of the challenges he faced at the outset of this case.  However, Mr. McKenzie's recent conduct does not define him or the person he hopes to become for himself and his son.  Mr. McKenzie needs additional community support to become the productive member of society he hopes to be, and a sentence of time served is sufficient, but not greater than necessary, to achieve the goals of sentencing.

1

A Childhood Burdened by Trauma.
"That's my son; I love him and he loves me." – Daniel Ross

Darren Milton McKenzie-Ross was born on September 5, 1998 in Bedford Hospital in Brooklyn to his parents Daniel Ross (71) and Patricia McKenzie (59). Mr. McKenzie was raised in East New York and is the youngest of his mother's children: his sister Maquesha McKenzie (38), his brother Percell McKenzie (37) and his sister Olivia McKenzie (32).  Mr. Ross also has two older children from another relationship: Ramona Ross (47) and Willie Ross (44).



Mr. McKenzie with his mother.

Mr. McKenzie's childhood was defined by his parents' substance abuse and ongoing dislocation.  Mr. Ross and Ms. McKenzie have been in a relationship for 32 years.  Ms. McKenzie retired in 2024 and receives SSI along with support from Mr. Ross.  Before Mr. McKenzie was born, Ms. McKenzie had three children from another relationship.  Unfortunately, she suffered through years of domestic violence with her former partner.  She relayed that she spiraled into depression and anxiety, and ultimately suicidal ideation, given the extent of the abuse that she endured.  She also fell into substance abuse with crack cocaine.  Given her addiction and fragile mental health, she was unable to care for her three older children. █████████ ████████████████████████████████████████.

Ms. McKenzie met Mr. Ross in 1994 and they formed a loving relationship. As Ms. McKenzie described in her letter of support, "at that time in my life, I was trying to put the pieces of my life back together after an abusive relationship." *See* Exhibit A (Patricia McKenzie letter of support).  Mr. Ross quickly became a father figure to her children and the couple welcome Mr. McKenzie a few years later.

Mr. Ross is a Vietnam War veteran who served in the United States Army for four years.  PSR ¶37.  However, Mr. Ross had early struggles with substance abuse and completed outpatient treatment during his time in the military.  Like many who served in the Vietnam War, he returned to civilian life burdened by trauma █████████████████████████████████.  He would struggle with ████████ substance abuse for many years into the future, which directly impacted Mr. McKenzie's childhood.  Mr. Ross had several jobs after the military, including working in construction and for a moving company.  In 2000, when Mr. McKenzie was two years old, Mr. Ross became a licensed street vendor and sold hats, scarves,

2

t-shirts, and other items near Radio City Music Hall in Manhattan.  Mr. McKenzie came to work with his father nearly every day in his youth.  Mr. Ross recalls one day in particular that he was suffering from ██████████████████████ and Mr. McKenzie quickly brought him food to prevent his father from passing out on the sidewalk.  Ms. McKenzie also worked several jobs during Mr. McKenzie's childhood, including with the MTA and at the Chelsea Recreation Center, where she stopped working after a workplace injury among other challenges.

Ms. McKenzie and Mr. Ross both suffered from a severe addiction to crack cocaine throughout Mr. McKenzie's young life.  Mr. McKenzie recalls witnessing both of his parents regularly abuse crack cocaine, having to discard drug paraphernalia used by his parents, missing school days when his parents did not take him to school, and observing strangers visiting the home consistent with his parents' substance abuse.  PSR ¶40.  Although the PSR indicates that Mr. McKenzie did not witness his parents' substance abuse, *see* PSR ¶39, after further consultation with Mr. McKenzie, Ms. McKenzie, and Mr. Ross, it appears that the sensitive nature of his parents' substance abuse is a deeply painful matter that Mr. McKenzie and his parents are still coming to terms with many years later.

When Mr. McKenzie was still young, Ms. McKenzie entered an inpatient residential treatment program specifically for women with young children.  Ms. McKenzie participated in residential treatment for over one year and graduated from the program.  Although the PSR indicates that Mr. McKenzie was removed from his home by ACS at three years old and placed in foster care, *see* PSR ¶39, further investigation has clarified that ██████████████    ██████████████ ████████████████████, Mr. McKenzie was not removed from his parents' home nor placed in foster care by ACS.  Instead, the period of his absence from his home was due to his mother's participation in inpatient residential treatment described above.  After Mr. McKenzie lived with his mother in the program for over one year, he returned to his father's home in East New York as his mother continued her recovery.  Unfortunately, Mr. Ross was still grappling with █████████████████████ at that time and did his best to raise Mr. McKenzie.

Mr. McKenzie's childhood was also interrupted by several periods of dislocation.  After he lived with his father for some years, his father was no longer in a position to care for him.  Similarly, his mother was not in a position to care for him full-time, as Mr. McKenzie recalls attending Alcoholics Anonymous ("AA") meetings with his mother as young as eight years old.  PSR ¶40.  Mr. McKenzie and his older maternal siblings were sent to live with their maternal grandmother, Lucielle McKenzie, in Far Rockaway, Queens and briefly with his paternal aunt,

3

Mildred Ross (63), in Flushing, Queens.  PSR ¶39.  His grandmother did her best to provide a safe and loving home for her grandchildren, but she also struggled to make ends meet, particularly with four additional mouths to feed, besides her own children and other grandchildren.  Given his parents' persistent substance abuse and his constant dislocation, Mr. McKenzie often struggled with feelings of abandonment and isolation.

The East New York neighborhood of Mr. McKenzie's youth was unfortunately prone to pervasive crime and violence.  New York City in the 1990s was still gripped by the outcomes of the crack cocaine epidemic, which ravaged low-income communities of color throughout the United States in the 1980s and 1990s.[1]  The crack cocaine epidemic was met with hostility and aggression by local and national leaders, as former New York City Mayor Ed Koch described "Those people who are users, I have no sympathy for them.  None at all."[2]  Cities such as Los Angeles responded to the crack cocaine epidemic with "an unprecedented scale in the militarization of policing, arrests, and incarceration," with the introduction of the Los Angeles Police Department's armored vehicle carrying a "battering ram" that regularly destroyed the homes of local residents.[3]  In 1993, East New York sustained "128 individual murders, the highest number to date in any one precinct in NYPD history . . .  [which represented] the beginning of a decade that earned the Brooklyn neighborhood the uninviting nickname "the Killing Fields of New York," becoming the precinct with the highest number of unsolved murders in all of New York."[4]  When Mr. McKenzie was born in 1998, New York City sustained 629 homicides compared to 309 in 2025.[5]

---

[1] Todd Bookman, *Addiction, compassion, race: Looking back at the crack epidemic*, WHYY.org (Feb. 22, 2016), https://whyy.org/segments/addiction-compassion-race-looking-back-at-the-crack-epidemic/.

[2] Todd Bookman, *Addiction, compassion, race: Looking back at the crack epidemic*, WHYY.org (Feb. 22, 2016), https://whyy.org/segments/addiction-compassion-race-looking-back-at-the-crack-epidemic/.

[3] Donna Murch, *Crack in Los Angeles: Crisis, Militarization, and Black Response to the Late Twentieth-Century War on Drugs*, 102 J. Am. History 1, 162 (2015), https://diversity.williams.edu/davis-center/files/2015/05/Crack-in-Los-Angeles-Crisis-Militarization-and-Black-Response-to-the-Late-Twentieth-Century-War-on-Drugs.pdf.

[4] Eric Spitznagel, New York Post, *How this thriving NYC neighborhood became a 'killing field' — with a haunting legacy of unsolved murders it can't escape* (Jan. 23, 2025), https://nypost.com/2025/01/23/us-news/how-east-new-york-became-a-killing-field-with-nycs-most-unsolved-murders/ (emphasis added and omitted).

[5] New York City Police Department, *Citywide Compstat*, https://www.nyc.gov/assets/nypd/downloads/pdf/crime_statistics/cs-en-us-city.pdf (last accessed April 15, 2026).

As Mr. McKenzie did his best to navigate the ongoing violence around him, he still faced constant upheaval at home. After he lived with his grandmother, he moved back in with his father in the years preceding high school. At that time, their relationship became increasingly strained. His father was still struggling with addiction and inconsistent income as a street vendor, which made it difficult for Mr. Ross to provide for his son. Mr. McKenzie recalls several times when the electricity was turned off at home as his father fell behind in paying the utility bills. Additionally, Mr. Ross dealt with a short temper, ███████████████████ ████████, and used physical violence during confrontations with Mr. McKenzie in order to discipline him. PSR ¶41. Eventually, Mr. Ross sent Mr. McKenzie to live with a family friend named Guy Rivers. PSR ¶40. Mr. McKenzie continued to have interpersonal conflicts with Mr. Rivers and was sent back to his father's home. During this difficult period, Ms. McKenzie moved back into the family home. Rather than being a cheerful homecoming, his parents' substance abuse challenges and Mr. McKenzie's regular arguments, which his parents interpreted as disrespectful, created more conflict in the home. Eventually, Mr. McKenzie and his parents mutually agreed that Mr. McKenzie would resume living with other relatives while he was in high school.

Along with the instability he experienced at home, Mr. McKenzie struggled to keep up with his peers in school. While he enjoyed math and science, he could not read at the same level as other children in his grade. Mr. McKenzie recalls being placed on an Individualized Education Plan in the fourth grade to improve his reading skills. Mr. McKenzie attended P.S. 72 for elementary school,[6] I.S. 218 for junior high school, and William H. Maxwell Career and Technical Education High School ("Maxwell"), all of which are located in East New York. PSR ¶57. Maxwell is a career and technical education ("CTE") high school that "offers five career and technical education majors: Barbering, Cosmetology, Graphic Design, Fashion Design, and Nursing Assistant" along with AP courses to provide students with a "balance of rigorous academics and hands-on career training [that] ensures students

---

[6] P.S. 72 appears to have been closed in 2012 due to poor academic performance. *See* News 12 Brooklyn, *East New York's P.S. 72 next on chopping block* (Dec. 15, 2008), https://brooklyn.news12.com/east-new-yorks-ps-72-next-on-chopping-block-34794004; *see also* Public School Review, *Overview*, https://www.publicschoolreview.com/psis-72-annette-p-goldman-middle-school-profile (last accessed Apr. 15, 2026). Further, it appears that P.S. 72 was subsequently replaced by the East New York Elementary School Of Excellence, which maintains the same address as the former P.S. 72. *See* East New York Elementary School Of Excellence, *Homepage*, https://enyese677.org/ (last accessed Apr. 15, 2026).

are well-prepared for both college and workforce."[7]  At Maxwell, Mr. McKenzie focused on courses related to digital media.

Mr. Ross and Ms. McKenzie have confirmed that Mr. McKenzie was later diagnosed with dyslexia in high school, while Mr. McKenzie recalls an informal reference to the possibility that he may have suffered from dyslexia and bipolar disorder in elementary school.  PSR ¶50.  However, Mr. McKenzie did not receive any formal mental health or developmental diagnoses prior to high school, and to date, has not received any formal diagnosis for bipolar disorder.  PSR ¶50.  However, as noted in the psychological evaluation prepared by Dr. Griffing, "Although Mr. McKenzie's academic delays were identified in elementary school, he does not appear to have received sufficient support to remediate them."  Exhibit B.

During high school, his family friend Mr. Rivers helped Mr. McKenzie secure his first part-time job working after school at Tony's Supermarket near his parents' home to have additional income for personal expenses.  PSR ¶41.  At Tony's, he packed bags, fixed machines, restocked products, and cleaned bottle machines.  Mr. McKenzie also worked other odd jobs at various points throughout his time in high school, including in construction, roofing, and security.  PSR ¶41.  However, the isolation and neglect of his home life continued to haunt him, and he ultimately had his first contact with the criminal justice system when he was a junior in high school.  PSR ¶¶27, 57.

Additionally, after witnessing years of substance abuse in his family, he had his own encounters with substance abuse.  At 14, he began drinking alcohol and smoking marijuana and engaged in daily marijuana use for several years.  PSR ¶54.  He also engaged in other substances including ecstasy and "lean," a combination of codeine and promethazine.  PSR ¶55.

### Becoming a Father.

Despite the constant upheaval at home, his life changed dramatically in 2022 when he became a father.  At Maxwell, Mr. McKenzie met Alexis Jackson (26), and they later started a relationship.  PSR ¶42.  His relationship with Ms. Jackson provided the first measure of stability he felt in his life in several years.  As their relationship progressed, they dreamed of building a life together.  Mr. McKenzie

---

[7] William H. Maxwell Career and Technical Education High School, *Academics*, https://www.whmaxwell.com/apps/pages/index.jsp?uREC_ID=4403671&type=d&pREC_ID=2629718 (last accessed Apr. 15, 2026) (emphasis added).

was motivated him to find more consistent employment and started working at a Wingstop in East New York near Euclid Avenue.  PSR ¶59.

In 2022, Mr. McKenzie moved in with Ms. Jackson, and they lived at her parents' home in Bedford-Stuyvesant.  After a few months, the couple began the process to secure their own apartment in public housing.  Together, they relocated to a shelter in Jamaica, Queens while she was pregnant.  After a few months, they relocated again to a hotel in the Bronx. ███████████████, the couple welcomed their son Adonis Amiri Ross into their family.  Mr. McKenzie was overjoyed with the birth of his son and looked forward to securing an apartment so that he and Ms. Jackson could settle in as a family. Unfortunately, their lives would face significant disruption just one month after Adonis was born when Mr. McKenzie was arrested in September 2022.



(L-R): Mr. Ross, Mr. McKenzie, his son and Ms. Jackson

### The Trauma of Incarceration.

After Mr. McKenzie's arrest, he was detained at Rikers during the pendency of his state case in Queens County.  PSR ¶28.  Ms. Jackson visited Mr. McKenzie every other weekend to support him as she also dealt with the reality of being an unexpected single parent.  Without Mr. McKenzie's income, although limited, she was unable to support herself and their son, and moved back in with her parents.  PSR ¶42.  Ms. Jackson continues to live with her parents, and receives public assistance and financial support from her family.  Mr. McKenzie ultimately pled guilty to Attempted Criminal Possession of a Weapon in the Second Degree and was sentenced to three years in prison.  PSR ¶28.

While in prison, Mr. McKenzie had a difficult transition to incarceration. Unlike his detention at Rikers, Ms. Jackson was not able to visit him at the upstate facility due to logistical challenges.  His separation from his infant son and the only consistent support in his life in Ms. Jackson only amplified his long-standing feelings of isolation, abandonment, and undiagnosed mental health challenges, and were likely the underlying circumstances for the series of infractions he sustained during his state sentence and multiple periods in solitary confinement.  Further, Mr. McKenzie was attacked by another detainee, and sustained a permanent injury to his face, which required 16 stitches.  PSR ¶46.

Notably, during his incarceration at Fishkill Correctional Facility ("Fishkill"), a review of available records indicated that Mr. McKenzi █████████████████ ████████████████████████████████████████████████ in July 2025, two months before his release from custody.[8] Although Mr. McKenzie received ██████████████████████████ at Fishkill, he never received a mental health diagnosis, treatment, nor medication during his incarceration.

Notably, as described in Dr. Griffing's evaluation, █████████████████



Exhibit B.

### A Downward Spiral.

Ms. Jackson reports that when Mr. McKenzie was released in September 2025, she traveled to the prison to pick him up. Once he was home, she noticed that he did not seem to be the same person that she had known since high school. She observed that he was withdrawn, argumentative in ways unlike his behavior before his incarceration, and seemed constantly agitated. Mr. McKenzie was in a dark place mentally and emotionally and did not have an outlet to process his severe trauma. His parents recognized that he was in crisis and ████████████ █████████████████████████████████████████████████. PSR ¶52. However, much like his incarceration, Mr. McKenzie did not receive a mental health diagnosis, treatment, nor medication ███████████████. PSR ¶52.

A mere three weeks after his release from state custody, Mr. McKenzie committed the instant offense on September 22, 2025. Mr. McKenzie deeply regrets his conduct in this case when he punched Agent 1. Notably, although Agent 1 was conducting surveillance in an undercover capacity, he was not wearing any visible clothing, insignia, or badge indicating that he was an FBI agent or federal official at

---

[8] New York State Department of Corrections and Community Supervision Bureau of Mental Health, Mental Health Program Descriptions – 7/5/11, https://www.op.nysed.gov/sites/op/files/surveys/mhpsw/doccs-att6.pdf (last accessed April 15, 2026) ("The goal of the RCTP is to evaluate and treat inmate-patients in need of short-term crisis mental health care. RCTPs have both observation cells and a dorm area for inmate-patients in crisis and in need of intensive treatment and monitoring.").

the time of the incident.  Further, there is no indication that he was engaged in any surveillance or investigation of Mr. McKenzie, or that Mr. McKenzie was the target of any investigation by federal law enforcement.  Additionally, Mr. McKenzie had no prior contact, conflict, or interaction with Agent 1 prior to the incident.  Although the apparent random nature of the offense was a cause for concern, it appears clear that Mr. McKenzie did not seek to harm Agent 1 specifically because of his status as an FBI agent or member of federal law enforcement.   Instead, Mr. McKenzie appears to have been in the throes of an undiagnosed mental health crisis at the time of the incident.  Notably, Mr. McKenzie quickly accepted responsibility for his conduct and pled guilty 47 days after his arrest.  *See* ECF 1, 9.

Mr. McKenzie Endured Extremely Harsh Conditions at MDC.

Mr. McKenzie has been detained at MDC for nearly eight months and has endured extremely harsh conditions.  While at MDC, he has witnessed ever-present violence, where 17 people have died since 2020[9] and other detainees have been stabbed and beaten.  Tragically, Mr. McKenzie was attacked by eight people in December 2025, only three months after his arrest, and was stabbed at least six times in his back.  PSR ¶49.  He was also told by a treating nurse that he may have suffered a collapsed or punctured lung.  Despite this severe injury, he was only given 400 mg of Ibuprofen and to date has received no further medical attention, despite making repeated requests to MDC staff.  Mr. McKenzie continues to suffer ongoing pain from the stabbing incident.  He experiences near constant pain in his back and upper shoulder, which intensifies when he is handcuffed and seated.  He also has experienced regular trouble breathing and sleeping.  Undersigned counsel has followed up with the legal department at MDC to request that Mr. McKenzie be treated at a medical facility in the community.  At this time, undersigned counsel is awaiting an update on any further medical attention as of the date of this memorandum.

As this Court is well aware, MDC has been subject to near constant lockdowns since the onset of the pandemic, as people are often locked in their cells for days at a time, with minimal time outside of the cell, even to take a shower.  Additionally, Mr. McKenzie has endured the unsanitary conditions and dilapidated

---

[9] Katie Quandt and Maeve Brennan, The Appeal, *Lockdowns, Violence, and "Barbaric Conditions" in a Federal Jail Known for its Famous Detainees* (June 30, 2025), https://theappeal.org/brooklyn-metropolitan-detention-center-solitary-watch/.

9

infrastructure that have been widely reported,[10] including broken lights, vents, and toilets.  Additionally, Mr. McKenzie has been placed in solitary confinement several times throughout his detention at MDC, which has limited his ability to remain in contact with Ms. Jackson, his son, his other family members, and his legal team.  Despite these numerous challenges, Mr. McKenzie is slowly taking steps to rebuild his life.  He is reading a motivational book targeted for individuals in custodial settings and has participated in anger management classes.  Additionally, he is on a waitlist to enroll in GED classes.

As this Court is aware, judges in this district and SDNY have granted leniency at sentencing for defendants incarcerated at MDC given the severe conditions.  These courts have acknowledged that the unusual harshness of incarceration diminishes the retributive or deterrent need for a guidelines sentence, and they have imposed terms of imprisonment that are substantially lower than the bottom of the defendants' advisory guidelines ranges, including many sentences for time served.  In 2024, Judge DeArcy Hall cited the conditions at MDC as part of her consideration in imposing a sentence of probation in a drug courier case where the guidelines range was 37-46 months:

> I just have to state for the record that in fashioning an appropriate incarceratory sentence here would have proven difficult given the conditions that persist at MDC.  The Court would likely have imposed a sentence which would have made it possible that the entire period of incarceration would have been served at MDC and that would have given me great pause.  I need to say this on the record as often as possible until the Government recognizes what it needs to do to ensure that the conditions at MDC change.  It is affecting the way in which judges are imposing sentences.  It is, in some cases, requiring us, demanding that we sentence people for less time in jail than we otherwise would because the Government has failed to ensure that the conditions at MDC are improved and are improved at a level commensurate with what I believe is this great nation.

*United States v. Bayron Garcia*, 23-cr-56, Tr. 22:14-23:7 (LDH) (E.D.N.Y. Apr. 10, 2024).

---

[10] Courtney Gross, Spectrum News, *Exclusive: Inmates decry conditions inside Brooklyn jail* (June 24, 2024), https://ny1.com/nyc/all-boroughs/politics/2024/06/24/brooklyn-federal-jail-murder-conditions?cid=share_clip.

Further, as SDNY Judge Furman wrote, "confining [people] to their cells [at MDC] is . . . tantamount to solitary or near-solitary confinement, a practice that is increasingly viewed as inhumane." *United States v. Gustavo Chavez*, 22-cr-303 (S.D.N.Y. Jan. 4, 2024) (emphasis added and omitted).  *See also United States v. Phillip Placide*, 21-cr-539 (AMD) (E.D.N.Y. July 19, 2022) (imposing time served sentence after 1 year of detention at MDC); *United States v. Narcissi*, 20-cr-449 (RPK) (E.D.N.Y. Mar. 15, 2021) (imposing time-served sentence where guidelines range was 24-30 months); *United States v. Temagen Stephenson*, 20-cr-511 (AMD) (E.D.N.Y. Aug 9, 2022) (imposing time served sentence after 2 year detention at MDC); *United States v. Shi*, 19-cr-451 (PKC) (E.D.N.Y. Nov. 2, 2020) (imposing no prison where guidelines range was 12-18 months); *United States v. Piper*, 18-cr-008 (AMD) (E.D.N.Y. June 25, 2020) (imposing time-served sentence on resentencing where bottom of guidelines range was 63 months); *United States v. Camacho*, 19-cr-389 (CM) (S.D.N.Y. Nov. 19, 2020) (imposing time-served sentence where bottom of guidelines range was 57 months); *United States v. Paulino*, 19-cr-607 (AJN) (S.D.N.Y. Oct. 21, 2020) (imposing time-served sentence where bottom of guidelines ranges was 27 months); *United States v. Aracena de Jesus*, 20-cr-19 (PAE) (S.D.N.Y. July 1, 2020) (imposing time-served sentence where bottom of guidelines range was 30 months).

Building on those remarks, Judge Brown further explained that a lower sentence was warranted because of the "dangerous, barbaric conditions that have existed for some time at the Metropolitan Detention Center ("MDC") in Brooklyn." *United States v. Colucci*, 23-cr-417 (GRB), 2024 WL 3643857, *1 (E.D.N.Y. Aug. 5, 2024).  Judge Brown detailed these conditions at length, noting that "Chaos reigns, along with uncontrolled violence." *Id*. at * 4.

<u>Mr. McKenzie will bear the brunt of collateral consequences with a felony conviction.</u>

A felony conviction triggers a host of collateral consequences, including significant barriers to public benefits, housing, employment, education, jury service, and access to credit and financial services.  PSR ¶76.

> Collateral consequences affect many areas of life.  Some criminal convictions can lead to loss of civil status; a citizen may lose the right to vote, serve on a jury, or hold office; a noncitizen may be deported or become ineligible to naturalize.  A conviction may make a person ineligible for public benefits, such as the ability to live in public housing or hold a driver's license. . . .  A criminal

11

> conviction can also make a person ineligible for a license or permit necessary to be employed or to do business, or cause forfeiture of a pension. Criminal convictions can also affect family relations, such as the ability to have custody or visitation of one's child.[11]

In New York, a felony conviction can subject someone to 374[12] separate barriers to employment, including absolute bars on becoming a Certified Nursing Assistant,[13] a firefighter,[14] a security guard,[15] or even working as the director of a funeral home.[16] These collateral consequences should be considered in the Court's analysis of the § 3553(a) factors and they favor imposing the minimum punishment. *See United States v. Nesbeth*, 188 F. Supp. 3d 179, 194-95 (E.D.N.Y. 2016).

<u>The Court Should Impose a Sentence of Time Served.</u>

Further, the Court is not bound to impose a sentence that the guidelines recommend. *Rosales Mirales v. United States*, 585 U.S. 129, 133 (2018); *United States v. Booker*, 543 U.S. 220, 264 (2005). Rather, the Court must obey "the parsimony principle, a broad command that instructs courts to 'impose a sentence sufficient, but not greater than necessary, to comply with'" the sentencing purposes of 18 U.S.C. § 3553(a)(2). *Dean v. United States*, 581 U.S. 62, 67 (2017). These are imposing a punishment that reflects the seriousness of the offense, promotes respect for the law, and provides just punishment; deters the defendant and the public; protects the public from additional crimes by the defendant; and provides needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *Id.*; § 3553(a)(2). In determining what sentence meets those ends, the Court should consider the nature and circumstances of the offense and Mr. McKenzie's personal history and characteristics, § 3553(a)(1), the kinds of sentences available and the sentence recommended by the Sentencing Guidelines, § 3553(a)(3)-(4), and the need to avoid unwarranted disparities, § 3553(a)(6).

---

[11] Gabriel J. Chin et al., Academy for Justice, *A Report on Scholarship and Criminal Justice Reform* 371-395 (2017) (emphasis added).

[12] *See* National Inventory of Collateral Consequences of Conviction, *Collateral Consequences Inventory*, https://niccc.nationalreentryresourcecenter.org/consequences.

[13] *See* 10 CRR-NY § 402.7 ("Where the criminal history information of a prospective employee reveals a felony conviction at any time for a . . . class B or C felony, any class D or E felony defined in articles . . . 155 [Larceny offenses], . . . of the Penal Law or . . . any comparable offense in any other jurisdiction, the Department shall propose disapproval of such person's eligibility for employment. . . .") (emphasis added and omitted).

[14] *See* N.Y.C. Admin. Code § 15-103(b).

[15] *See* N.Y. Gen. Bus. L. §§ 74(2), 89-h(4).

[16] *See* N.Y. Pub. Health L. § 3450(1)(b).

Here, the § 3553(a) factors support a sentence of time served.  Mr. McKenzie has suffered a lifetime of trauma, from witnessing his parents' persistent substance abuse, to constant dislocation in his youth, to experiencing the separation of his young family as he was making strides to create the stability and permanence he so desperately sought in his life.  Although he cares deeply for his son, he has only spent less than two months in his son's life, who will turn four years old in four months.  Further, as outlined in the psychological evaluation prepared by Dr. Griffing, *see* Exhibit B, Mr. McKenzie has also been burdened by undiagnosed mental health challenges, including "symptoms of mood instability and anxiety" and "Unspecified Mood Disorder" and recommended a comprehensive psychological evaluation, counseling, and employment services.  Further, the defense has prepared a re-entry plan with proposed services to ensure Mr. McKenzie's successful re-integration into the community.  *See* Exhibit C.  Additionally, courts in this District have imposed time served sentences for convictions under 18 U.S.C. § 111(a)(1).  *See United States v. Jamil Johnathon Hijazi*, 21-cr-00531 (LDH) (two years probation); *United States v. Bruce Davis*, 22-cr-00201 (KAM) (three years probation); *United States v. Mikal Tariq Leahr*, 23-cr-361 (NGG) (time served one year supervised release).  An additional custodial sentence would only further serve to worsen Mr. McKenzie's mental health and create additional barriers for him to receive the community support that he needs to move forward for himself, his son, and his family.

### CONCLUSION

Based on the foregoing, we respectfully request that the Court impose a sentence of time served, as such sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing.

Respectfully submitted,

/s Karume James
Karume James
Attorney for Darren McKenzie
Assistant Federal Defender
Federal Defenders of New York
(347) 638-3098
karume_james@fd.org

cc:    AUSA Matthew Sullivan (by ECF and email)
       Chambers of the Hon. Ramon E. Reyes (by email)