

**U.S. Department of Justice**

_United States Attorney_
_Eastern District of New York_

MWG:MFS                                  _271 Cadman Plaza East_
F. #2025R00558                           _Brooklyn, New York 11201_


April 22, 2026


<u>By ECF</u>


The Honorable Ramon E. Reyes
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:    United States v. Darren McKenzie
>        <u>Criminal Docket No. 25-304 (RER)</u>

Dear Judge Reyes:

The government respectfully submits this letter in advance of the sentencing hearing scheduled for Thursday, April 30, 2026, at 3:00 p.m. On November 10, 2025, the defendant Darren McKenzie pleaded guilty to the sole count in the Indictment, charging him with assault of a federal officer, in violation of 18 U.S.C. §§ 111(a)(1) and 111(b). For the reasons discussed below, the government respectfully submits that a sentence of 41 months' imprisonment, which is at the top of the applicable United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 33 to 41 months' imprisonment, would be sufficient, but not greater than necessary, to achieve the goals of sentencing set forth at 18 U.S.C. § 3553(a). In addition, the government is seeking a restitution order in the amount of $3,331.98 for the harm suffered by the victim of the defendant's offense conduct.

I.      <u>Background</u>

        A. <u>Offense Conduct</u>

At approximately 10:30 a.m. on September 22, 2025, an FBI Special Agent ("Agent-1") was conducting surveillance on foot and in plain clothes (<u>i.e.</u>, without wearing any markings identifying him as an FBI Special Agent) in the vicinity of 115 Ocean Avenue in Brooklyn. PSR ¶ 3. While Agent-1 stood on the sidewalk, the defendant approached him and punched Agent-1 once in the face, making physical contact with the agent's nose and mouth. <u>Id.</u>

The assault was captured on surveillance video, which is attached as Exhibit A, from a building located at 115 Ocean Avenue. As seen in the video, and in screenshots from the video set out below, Agent-1 was conducting surveillance of the location when the defendant

approached him (green circle is Agent-1; red circle is the defendant):

 

See Ex. A at 02:58 – 03:34.  After approaching Agent-1—and without provocation—the defendant then punched Agent-1 in the face, with the force of the punch knocking Agent-1 to the ground:

 

See id. at 03:34 – 03:40.  After the assault, Agent-1 located another FBI agent ("Agent-2") who was working surveillance with him nearby. PSR ¶ 4.  Agent-1 informed Agent-2 that he had been assaulted, and Agent-1 identified the defendant, who was still in the area and visible to Agent-1 and Agent-2, as the perpetrator of the assault.  Id.  During this time, the defendant began to walk away from the scene, and Agent-1 and Agent-2 followed after him.  See Ex. A at 03:40 – 04:50.

Agent-2 followed the defendant inside a nearby subway station and observed the defendant jump the turnstile without making a payment.  Id. ¶ 5.  Agent-2 directed the defendant to come back through the turnstile and to exit the subway station and return to the street.  Id.  New York City Police Department ("NYPD") officers arrived on the scene, and the defendant was placed under arrest by the NYPD.  Id.

Agent-1 was transported to Kings County Hospital where he was treated for the injuries he sustained from the assault, including a broken nose, concussion, and laceration to his nose.  Id. ¶ 6.  Medical records indicate that Agent-1 reported to medical staff symptoms of amnesia, loss of consciousness, and a head injury.  Id.

2

B.  The Charges and Guilty Plea

On September 24, 2025, the defendant was arrested and charged by complaint with assault of a federal officer, in violation of 18 U.S.C. §§ 111(a)(1) and 111(b).  That same day, the defendant was arraigned and ordered detained by the Honorable Robert M. Levy, United States Magistrate Judge.  On October 3, 2025, the defendant was indicted on one count of assault of a federal officer, in violation of 18 U.S.C. §§ 111(a)(1) and 111(b).

On November 10, 2025, the defendant pleaded guilty, without a plea agreement, to the sole count of the Indictment before Honorable Seth D. Eichenholtz, United States Magistrate Judge.  On December 19, 2025, the Court accepted the defendant's guilty plea.  The defendant will have spent approximately seven months in custody as of the scheduled date of sentencing.

C.  Additional Criminal History

In addition to the case presently before the Court for sentencing, the defendant has two prior convictions for engaging in physical violence.  See PSR ¶¶ 27-28.  First, on May 25, 2017, the defendant punched the dean at his high school in the face.  Id. ¶ 27.  For his actions, on June 18, 2018, the defendant was sentenced to a one-year conditional discharge for third-degree assault with the intent to cause physical injury.  Id.  Second, on September 6, 2022, the defendant engaged in an armed carjacking of a couple and their one-year-old daughter.  Id. ¶ 28.  Specifically, the victims were getting into a vehicle when the defendant approached, pointed a handgun at them (including the one-year-old), and demanded money and their vehicle, repeatedly saying, "I will shoot you."  Id.  After the defendant took money from the victims, he then fled on foot and abandoned the handgun.  Id.  For his actions, on March 15, 2023, the defendant was sentenced to a three-year prison term for second-degree attempted criminal possession of a loaded firearm.  Id. ¶ 28.  While incarcerated in New York State, the defendant was involved in at least ten incidents of assault and violent conduct, which included assaults on staff and other inmates, and that resulted in numerous disciplinary sanctions.  Id.

D.  The Defendant's Violent Behavior Continued After His Release from State Incarceration in September 2025

The defendant was released from incarceration on September 4, 2025.  Over the course of the next three weeks, the defendant would engage in three separate assaults, including the offense conduct at issue in this case.  First, on September 10, 2025, the defendant went to the residence of the mother of his son multiple times after being told by her not to, and during one encounter, the defendant grabbed her land and attempted to break it.  See Addendum to the PSR (Apr. 15, 2026).  Second, on September 22, 2025, the defendant engaged in the offense conduct in this case involving his assault of Agent-1.  Third, on September 23, 2025, after being arrested, the defendant was in a holding cell inside 120 Schermerhorn Street, in Brooklyn, where he walked up to an individual and punched him with a closed fist, causing a laceration to his right cheek and bloody eye.  PSR ¶ 35.  Finally, while the defendant has been detained at the MDC in connection with this case, he has been involved in multiple physical altercations with other inmates.  See id. ¶¶ 44, 47-49.

3

II.    Applicable Law

        The Supreme Court has explained that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  Gall v. United States, 552 U.S. 38, 49 (2007) (internal citation omitted).  Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [the sentencing court] may not presume that the Guidelines range is reasonable.  [The sentencing court] must make an individualized assessment based on the facts presented."  Id. at 49-50 (internal citations omitted).  However, "in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'"  Kimbrough v. United States, 552 U.S. 85, 109 (2007); see also United States v. Fernandez, 443 F.3d 19, 27 (2d Cir. 2006) ("[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances.").  Indeed, the Supreme Court has held that, on appeal, a Guidelines sentence may be presumed to be reasonable because "the sentencing statutes envision both the sentencing judge and the [Sentencing] Commission as carrying out the same basic § 3553(a) objectives."  Rita v. United States, 551 U.S. 338, 358 (2007).  "An individual judge who imposes a sentence within the range recommended by the Guidelines thus makes a decision that is fully consistent with the Commission's judgment in general."  Id. at 350.  Furthermore, Guidelines sentences promote Congress' goal in enacting the Sentencing Reform Act: "to diminish unwarranted sentencing disparity."  Id. at 354.

III.    The Sentencing Guidelines Calculation

        The government agrees with the Probation Department that the defendant is in Criminal History Category is III, and that the calculation of his offense level is as follows:

| | | |
|---|---|---:|
| Base Offense Level (U.S.S.G. § 2A2.2(a)) | | 14 |
| Plus: | Victim Sustained Serious Bodily Injury (§ 2A2.2(b)(3)(B)) | +5 |
| Plus: | Defendant Convicted Under 18 U.S.C. § 111(b) (§ 2A2.2(b)(7)) | +2 |
| Less: | Timely Acceptance of Responsibility (§§ 3E1.1(a) and (b)) | <u>-3</u> |
| Total: | | <u>18</u> |

Based on a Total Offense Level of 18 and a Criminal History Category of III, the Guidelines range is 33 to 41 months' imprisonment.  The defendant has not objected to these Guidelines calculations.

4

IV.    Forty-One Months' Imprisonment with A Restitution Order Is an Appropriate Sentence

Here, the nature and circumstances of the offense, the history and characteristics of the defendant, the need to afford adequate deterrence, the need to protect the public, and the need to reflect the seriousness of the offense, promote respect for the law, and provide just punishment, warrants a Guidelines sentence of 41 months' imprisonment. See 18 U.S.C. § 3553(a).

The defendant's offense conduct was an unprovoked attack on Agent-1 as he conducted surveillance in the performance of his official duties. While the defendant only threw a single punch, it knocked Agent-1 to the ground, broke his nose, and gave him a concussion—which, to be precise, is a traumatic brain injury. The government agrees that Agent-1 was in plain clothes and that there is no evidence the defendant knew that Agent-1 was an FBI Special Agent. Cf. United States v. Feola, 420 U.S. 671, 684 (1975) (holding that § 111 does not require the defendant to know his victim is a federal officer and explaining that "[a]ll the statute requires is an intent to assault, not an intent to assault a federal officer"). Notwithstanding, at his change of plea hearing, the defendant stated that, "On September 22nd, I was being followed by a federal agent --" and "I struck [Agent-1] because he was following me." Nov. 10, 2025 Hearing Tr. at 26:13-17, 28:07-10. While the defendant did not know Agent-1 was an FBI Agent, it appears that the defendant believed Agent-1 was conducting surveillance—which he was, just not of the defendant—and shows that the defendant's motive for the assault was related to Agent-1's official duties.

Further, taking the assault in this case and viewing it within a larger context, it is apparent that the assault was not aberrant behavior by the defendant, but rather part of a larger pattern of the defendant's violent conduct. The defendant's criminal history shows that he was expelled from his high school after he punched the dean in the face. See PSR ¶¶ 27, 57. The defendant was then incarcerated after pleading guilty to attempted unlawful possession of a firearm, but the underlying facts show the case arose from an armed carjacking of a family and their one-year-old child. Id. ¶ 28. His violent behavior continued while he was serving his term of state incarceration where he was involved in at least ten incidents of violent conduct. See id. Then, less than three weeks after the defendant had been released from that state incarceration, and while he was on state parole, the assault constituting the offense conduct in this case occurred. Id. ¶¶ 3, 28. The defendant's assault of Agent-1 was just one of three assaults he committed in the three weeks that he was released from state incarceration—one involving a domestic dispute with the mother of his child and another involving another prisoner in the cell block after the defendant's arrest. See id. ¶ 35; Addendum to the PSR (Apr. 15, 2026). And finally, while detained at the MDC in this matter, the defendant was involved in several inmate-on-inmate physical altercations. See PSR ¶¶ 44, 47-49. In light of the defendant's history of violent behavior, a sentence of 41 months' imprisonment is necessary to deter the defendant, but also to provide just punishment and protect the public. See United States v. Eley, No. 23-7703, 2025 WL 502291, at *1 (2d Cir. Feb. 14, 2025) (summary order) (affirming above-Guidelines sentence where the district court noted, among other things, that the defendant's "criminal record evinced a continuing pattern of violence, even while detained and awaiting sentence"); United States v. Robbins, No. 22-1421, 2023 WL 8295256, at *2 (2d Cir. Dec. 1, 2023) (summary order) (affirming an upward variance where the district explained at sentencing that "[a] significant term of imprisonment is necessary to interrupt this pattern of violent behavior and to

5

deter you from engaging in such conduct in the future, and to protect the public from your conduct").

A sentence at the top of the Guidelines range is also necessary to reflect the seriousness of the offense. As outlined in Agent-1's victim impact statement, the assault has had a profound effect on Agent-1's personal and professional life.[1] Agent-1 suffers from "post-concussion syndrome" that is manifested in headaches, reduced stamina, and sleep disruption. PSR ¶ 11. Agent-1 was on medical leave for 45 days after the assault and then only returned to part-time administrative duty. Id. While Agent-1 returned to work full-time in January 2026—three months after the assault—Agent-1 still lacked full medical clearance to return to the field. Id. The assault, and resulting time on leave needed to recover, has affected the trajectory of Agent-1's FBI career. Id. In addition to effects on Agent-1's professional life, the assault also affected his personal life with his family being forced to navigate the effects on Agent-1's short-term and long-term memory. Id. So, while the assault may have involved just a single punch, the physical and emotional effects of that punch have been long-lasting. As part of the sentence, the Court should order restitution in the amount of $3,331.98 that represents the medical expenses and lost income to Agent-1 as a result of the defendant's offense conduct. See id. ¶ 10; see also 18 U.S.C. § 3663A(b)(2) (including medical expenses and lost income as items that "shall" be included in an order of restitution "in the case of an offense resulting in bodily injury to a victim"). The defendant has not objected to a restitution order or this restitution amount.

The defendant's proposed sentence of time served—effectively, seven months—would be woefully inadequate and would not reflect a proper application of the section 3553(a) factors. It would also fail to deter the defendant, specifically, given his violent history and that approximately 30 months in state incarceration did not deter him from reoffending. It would also fail to afford adequate deterrence generally as it would show there are no consequences for an unprovoked, violent attack on a federal officer that resulted in a traumatic brain injury with lasting effects.

In his Sentencing Memorandum ("Deft. Memo."), the defendant asserts that the conditions at the MDC are a potential mitigating factor which warrant a lower sentence, and he cites cases where courts have imposed a time-served sentence for defendants held at MDC. See Deft. Memo. at 10-11. But the caselaw relied upon by the defendant does not account for the improved conditions to the MDC since those cases were decided and they pre-date his September 2025 incarceration at the MDC. For example, in January 2025, Judge Caproni noted,

> Let me just say, to all of the: MDC is a horrible place, and it's
> awful, and they're going to be locked down forever, that's just not
> true anymore. All of those decisions that you read about were

---

[1] In connection with sentencing in this case, the government has been in contact with Agent-1 (as it has been throughout the case consistent with its obligations under the CVRA) as the date for the sentencing hearing has approached. The government understands that Agent-1 is aware of his right as a crime victim to be reasonably heard and to make a public statement at the defendant's sentencing hearing. Agent-1, however, has informed the government that he does not intend to make a statement at the defendant's sentencing and would rely on the victim impact statement that contained within the PSR.

> months ago.  There's a lot more staffing at the MDC.  The number of defendants who are ending up in lock down for substantial periods of time are minimal.

See United States v. Alexander, Transcript, No. 24-CR-676 (VEC) (S.D.N.Y. Jan. 16, 2025) (attached as Exhibit B).  In addition, Judge Furman—who decided United States v. Chavez, No. 22-CR-303 (S.D.N.Y.) that is cited by the defendant, see Deft. Memo. at 11—remarked in May 2025 that MDC is "a lot better than it was in January of last year when I wrote my opinion in United States v. Chavez."  United States v. Reshard, Transcript, No. 24-CR-392 (JMF) (S.D.N.Y. May 14, 2025) (attached as Exhibit C).  The present conditions at the MDC, therefore, do not warrant a lesser sentence in this case.

As another source of potential mitigation, the defendant points to the collateral consequences of a felony conviction and argues they "favor imposing the minimum punishment."  Deft. Memo. at 11-12.  But even prior to the felony conviction in this case, the defendant was already a convicted felon after he pleaded guilty and was sentenced in March 2023 to second-degree attempted criminal possession of a loaded firearm, which is a Class D Felony in New York State.  See PSR ¶ 28.  The defendant's status as a convicted felon will not change with the resolution of this case and therefore should not be considered as a mitigating factor at sentencing.

Finally, the defendant's sentencing memorandum describes the defendant's childhood and the effect that certain events had on his development and ongoing mental health.  The government recognizes the circumstances of the defendant's upbringing that is described in the PSR and detailed in his Sentencing Memorandum, but the government submits that they do not weigh in favor of a time-served sentence when compared against other section 3553(a) factors, including the needs to protect the public from the defendant's repeated, violent conduct and to afford adequate deterrence.

V.      Conclusion

For the foregoing reasons, the government respectfully submits that the defendant should be sentenced to a term of 41 months' imprisonment, followed by a term of supervised release, and ordered to pay $3,331.98 in restitution to the victim of his offense.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:     /s/ _____
        Matthew F. Sullivan
        Assistant U.S. Attorney
        (718) 254-6161

cc:     Clerk of the Court (RER) (by ECF)
        Karume James, Esq. (by ECF)